# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| JULIE MOSS | : | |
| Plaintiff, | : | |
| | | Case No. 3:09cv00005 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I. INTRODUCTION

Plaintiff Julie Moss applied for Disability Insurance Benefits (DIB) in August 2001 asserting that she was under a disability due to dizziness, obesity, migraines, depression, right wrist weakness, back pain, and depression. (Tr. 109). She claimed that her disability began on November 26, 2000. (Tr. 56). After initial administrative denials of her applications, an Administrative Law Judge (ALJ) held a hearing and later denied Plaintiff's DIB application. She did not pursue an administrative appeal of the ALJ's non-disability decision.

In September 2003 Plaintiff again applied for DIB and also applied for Supplemental Security Income (SSI). She asserted that her disability began on July 18, 2003. (Tr. 97-99; Plaintiff's SSI application is not the administrative record).

After initial administrative denials of her applications, ALJ James I.K. Knapp held

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

two hearings. (605-35; 636-54). He later issued a written decision denying Plaintiff's DIB and SSI applications, concluding primarily that Plaintiff was not under a "disability" within the meaning of the Social Security Act. (Tr. 16-31). ALJ Knapp's non-disability determination became the final decision of the Social Security Administration. This Court has jurisdiction to review such final decisions. *See* 42 U.S.C. §§405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), the administrative record, and the record as a whole.

Plaintiff seeks an Order reversing the ALJ's decision and granting her benefits or, at a minimum, an Order remanding this case to the Social Security Administration to correct certain alleged errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II. BACKGROUND

### A. <u>Plaintiff and Her Testimony</u>

At the time Plaintiff's disability allegedly began, her age (40 years old) placed her in the category of a "younger individual." *See* 20 C.F.R. §§404.1563(c); 416.963(c).[2]

Plaintiff earned a Graduate Equivalency Diploma and completed one year at Sinclair Community College. (Tr. 115, 334). Her past jobs included wire harness worker, office manager, retail manager, and outside deliverer. (Tr. 29, 110, 129-136).

During the ALJ Knapp's hearings, Plaintiff testified that she last worked in 2001. (Tr. 609). She stated that she could no longer work due to back pain, depression, and anxiety. (Tr. 609, 611). She had undergone epidural injections, physical therapy, and radiofrequency, but she continued to have low back pain that goes into her right leg. (Tr. 611). Her pain medications "take the edge off." (Tr. 612).

---

[2] The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.

2

Plaintiff further testified that when she became depressed, she did not want to be around anyone. (Tr. 612). Medication helped her feel less depressed. (Tr. 614).

Plaintiff estimated that she could walk one block most at a time, stand for 10 to 15 minutes at a time, sit for 10 to 15 minutes at a time, and lift 5 to 10 pounds, but lifting a jug of milk is difficult for her. (Tr. 617).

As to her daily activities, Plaintiff testified that twice a week she drove a car to her appointments. (Tr. 609). She watched television, listened to the radio, occasionally cooked meals using the microwave, tried to wash dishes, went shopping once a month, occasionally visited other people, played guitar, and knitted. (Tr. 614-15, 642). She typically lays down for 18 to 20 hours a day. (Tr. 623). On one recent occasion four of five years before ALJ Knapp's September 2007 hearing, Plaintiff went on vacation to Hocking Hills. While there, she merely stayed in a cabin rather than go hiking. (Tr. 648).

### B. Medical Evidence

**Terren B. Koles, M.D.** Plaintiff began seeing a primary care physician, Dr. Koles in August 2003. (Tr. 272). Dr. Koles referred her to a neurosurgeon – Dr. Taha – regarding a herniated nucleus pulposus at L5-S1 ("HNP L5-S1"). (Tr. 271). Dr. Koles' treatment notes indicate that he saw Plaintiff a total of 5 times between her initial appointment and mid-November 2003. (Tr. 270-72).

On November 25, 2003, Dr. Koles completed an Ohio Bureau of Disability Determination (Ohio BDD) questionnaire. (Tr. 267-69). He listed Plaintiff's diagnoses as diabetes mellitus II, a L5-S1 disc herniation, lumbar degenerative disc disease, questionable lupus, fibromyalgia, depression, questionable irritable bowel syndrome, hypothyroidism, and "'dizziness,' which may be lightheadedness (not true vertigo)." (Tr. 268). Dr. Koles noted that Plaintiff had received epidural injections two times in December 2002 and that she would undergo an anterior lumbar discectomy and fusion at L5-6 in December 2003 by Dr. Taha. (Tr. 268). Dr. Koles listed Plaintiff's medication as including, in part, Glucophage for type II diabetes (noting "good control") and Vicodin

3

(noting "takes the edge off pain"), and another medication for migraines. (Tr. 269). Dr. Koles found Plaintiff to be a "very thorough historian" and he indicated that she seemed compliant with his recommendations. *Id*.

Dr. Koles opined that Plaintiff could not sit, stand, or walk for more than 20 minutes at a time or lift and carry more than 10 pounds. *Id.* Dr. Koles stated that Plaintiff's dizziness limited her ability to drive and walk at times, that "dark room [was] 'a must' because of migraines, and that diarrhea "limits activity far from bathroom." *Id.*

**Jamal Taha, M.D.** In October 2003 Plaintiff reported to Dr. Taha, a neurologist, that the pain in her low back radiated into both legs with some paresthesia. (Tr. 301-03). On examination there was tenderness of her midline lower lumbar spine. Her range of motion was limited by pain. Deep tendon reflexes were absent in both knees. (Tr. 302).

Dr. Taha addressed an MRI taken one year earlier 2002 as follows:

I.  MRI lumbar spine reportedly demonstrates Disc herniation L5-S1 with degeneration L5-S1 and L4-5.

II. My review of the MRI lumbar spine does not agree. I believe the report is inaccurate. I believe the patient has a partially sacralized lumbar spine. L4-5 is the one degenerated with a herniated disc right and also some lateral herniation on the left with Grade I spondylolisthesis.

(Tr. 303). Dr. Taha thought Plaintiff was a potential candidate for surgery ("L4-5 PLIF"), although he noted that obesity and diabetes increased her risk of surgery. *Id*. (Tr. 329). He recommended an interbody fusion surgery. (Tr. 300). In December 2003 Dr. Taha performed a posterior lumbar lateral fusion of the L4-L5 disc and arthrodesis. (Tr. 283-90).

On month after surgery, Dr. Taha indicated that Plaintiff was doing relatively well and had progressed as expected. (Tr. 296). He noted that x-rays showed good placement of hardware in Plaintiff's back. *Id.* Dr. Taha completed a form for the Ohio Bureau of Disability Determinations (Ohio BDD) referring to his office notes. (Tr. 292). He noted that Plaintiff had a normal gait, *id*., and he otherwise indicated that her status was post-

4

surgery and that he would refer her for a functional evaluation study to determine level of function. (Tr. 295).

Several days later, on January 8, 2004, Plaintiff was involved in a motor vehicle accident. (Tr. 304-15). X-rays did not show any acute findings. (Tr. 315).

A June 2004 MRI of Plaintiff's lumbar spine showed post-fusion changes at L4-5 with "degenerative disc disease re-demonstrated at that level." (Tr. 325).

**Stephen R. Pledger, M.D.** Dr. Pledger, an orthopedic spine specialist, saw Plaintiff on December 29, 2004, for complaints of low back pain, stiffness, and right leg numbness. (Tr. 355-57). On examination Dr. Pledger reported that Plaintiff got up out of a chair normally; her posture and gait pattern were normal; she had normal toe walking and heel walking; she had positive Gower sign; she had pain with extension of her back and tenderness to palpation over the spinous processes of L3, L4, L5, sacrum and the right buttock. Straight leg raising test was negative bilaterally while in a seated position. (Tr. 356). Dr. Pledger further reported that Plaintiff had 5/5 muscle strength in the lower legs except in the extensor hallucis longus of the right side. She had decreased sensation of the right leg and absent reflexes in the knees. X-rays showed excellent lateral alignment of the spine. (Tr. 357).

Dr. Pledger diagnosed degenerative disc disease at L4-5, pseudarthrosis of spine fusion, and a right radiculitis at L5. *Id.* He recommended surgery including a posterior lateral fusion at L4-5. *Id*.

An August 2005 MRI of Plaintiff's lumbar spine showed a right paramedical disc bulge at L4-5 but no definite nerve root impingement. (Tr. 521). There was some minimal epidural fibrosis in the area of L4-L5. There was no significant change in the appearance since June 2004, although degenerative changes of the facet joints (hypertrophy) were seen at L3-4. (Tr. 521).

Dr. Pledger performed a nerve root block in September 2005. (Tr. 519-20). Injection at L4-5 replicated Plaintiff's normal pain but with less intensity than usual. (Tr.

5

519).  The nerve root block at L5 caused a radiating sensation down her right leg but was not qualitatively similar to her usual pain.  (Tr. 520).

Plaintiff continued to see Dr. Pledger approximately every three months from October 2005 to January 2007.  (Tr.  508-15; 525-27; 529-34).  He continued to diagnose degenerative disc disease and herniated disk and continued her medication.  *Id.*  An October 2006 EMG showed no significant abnormalities.  (Tr. 535).

On December 27, 2006, Dr. Pledger completed a form in which he assessed Plaintiff's abilities to perform work-related activities as follows: she could lift 2 to 5 pounds occasionally and frequently; she could stand or walk for about 1 to 2 hours in an 8-hour workday; and she could sit for about 1 to 2 hours in an 8-hour workday.  (Tr. 502-06).  Dr. Pledger believed that Plaintiff could occasionally balance, kneel, and crawl, and she could never climb, stoop, or crouch.  (Tr. 504).  Dr. Pledger further indicated that Plaintiff should not work at temperature extremes or be exposed to vibration.  (Tr. 505).

In a letter in late January 2007, Dr. Pledger reported that Plaintiff was morbidly obese, "which is another contributing factor to her disability.  Considering that she [has] a failed back fusion, the most she could possibly do is clerical type work.  However, she cannot sit, stand or walk for 10 minutes maximum.  This would preclude most types of clerical work." (Tr. 501).

**Beth Duvall, M.D.**  Plaintiff began seeing Dr. Duvall, for her primary care in April 2005.  (Tr. 475).  Dr. Duvall managed Plaintiff's medications, including her pain medications, as well as referrals to other sources.  (Tr. 448-75).

On October 24, 2006, Dr. Duvall completed functional assessment interrogatories opining that Plaintiff could lift or carry less than 10 pounds occasionally and frequently; stand or walk for 1 hour in an 8-hour workday; and sit for 3 to 4 hours in an 8-hour workday.  (Tr. 443-47).  In support of her opinions, Dr. Duvall identified her medical findings as chronic deconditioning and chronic low back degenerative joint disease with pain and limited weight lifting (Tr. 443) along with L4-L5 disc disease (Tr. 444).  Dr.

6

Duvall opined that Plaintiff could never climb, balance, stoop, crouch, kneel, or crawl. (Tr. 445). Dr. Duvall cited "poor posture" and pain with most activities including activities of daily living ("ADLs") as the medical findings to support these assessments. (Tr. 445-46).

The record also contains the opinions of several non-treating medical professionals.

**Anton Freihofner, M.D.** Reviewing the record in March 2004 for the Ohio BDD, Dr. Freihofner concluded that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, stand or walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. (Tr. 316-22). Dr. Freihofner thought Plaintiff could occasionally balance and stoop, and he believed she had limited handling with her right hand. (Tr. 319). When Dr. Freihofner reviewed the record, it did not contain any statement by a treating or examining medical source. (Tr. 321).

Walter A. Holbrook, M.D., reviewed the record in April 2005 and affirmed Dr. Freihofner's assessment, without providing any supporting explanation. (Tr. 322).

**Stephen P. Fritsch, Psy.D.** On June 30, 2004, Dr. Fritsch evaluated Plaintiff at the request of the Ohio BDD. (Tr. 334-36). Plaintiff informed Dr. Fritsch that she lived alone in an apartment. (Tr. 334). She also reported "that she is capable of basic domestic activity (cooking, cleaning, shopping, and basic management of household finances). Her niece comes by to do much strenuous household chores. (Tr. 334). Dr. Fritsch diagnosed a "Pain Disorder associated with both psychological factors and medical condition" along with chronic depressive symptoms. (Tr. 336). He opined that symptoms of depression and distraction caused her to be mildly impeded in her ability to concentrate and persist; she had the capacity to maintain appropriate work relationships; and she would have mild to moderate difficulty adaptively responding to typical demands and stresses in the workplace. (Tr. 336).

**William O. Smith, M.D.** On June 11, 2007, neurosurgeon Dr. Smith examined

Plaintiff at the request of the Ohio BDD. (Tr. 571-83). Dr. Smith reported that Plaintiff did not use a cane, she got on and off the examining table fairly easily, she had 5/5 strength in her arms, and she had decreased range of motion in all planes of the lumbar spine. (Tr. 572). Straight-leg raising caused low back pain at 41 degrees on the left and 28 degrees on the right. *Id*. She had a normal gait; 5/5 strength in her legs; some scattered areas of sensory change to pinprick, more consistent with L5-S1 on the right; and normal reflexes. *Id*. Dr. Smith diagnosed post-laminectomy syndrome, herniated disc at L4-5 right, type II diabetes, and obesity (5' 2"; 243 lbs). (Tr. 572-73). Dr. Smith noted that Plaintiff's pain was controlled with Vicodin and Flexeril. (Tr. 573).

Dr. Smith completed a Medical Source Statement concerning Plaintiff's ability to perform physical work-related activities. (Tr. 578-83). He opined that due to back pain, Plaintiff could lift up to 10 pounds occasionally and frequently, sit for 2 hours in an 8-hour workday, stand for 1 hour in an 8-hour workday, and walk for 1 hour in an 8-hour workday. (Tr. 579). Dr. Smith believed that Plaintiff could occasionally stoop, kneel, crouch, and crawl, and she could never climb stairs, ramps, ladders, or scaffolds. (Tr. 581).

**Arthur Lorber, M.D.** Dr. Lorber, an orthopedic surgeon, testified during ALJ Knapp's second hearing in September 2007. (Tr. 646-53). After summarizing the record, Dr. Lorber opined that Plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently; stand and walk for 2 hours a day and 30 minutes at a time; sit for 6 hours a day and 30 minutes a day; and occasionally bend, crouch, stoop, and kneel. (Tr. 652). Dr. Lorber believed that Plaintiff could do no crawling, no working at unprotected heights, and no climbing ladders, ropes, or scaffolds. *Id*. She could occasionally ascend a ramp or stairs. She needed to avoid all exposure to vibration. And she could not work on slippery, wet, or uneven surfaces; and she could not do any work that required her to balance. *Id*.

III.    **ADMINISTRATIVE REVIEW**

8

### A. "Disability" Defined

The definition of the term "disability" is essentially the same for both Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B. The ALJ's Decision

The ALJ resolved Plaintiff's disability claim by using the five-Step sequential evaluation of evidence required by the Regulations. *See* Tr. 16-24; *see also* 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).[3]

The ALJ concluded, in pertinent part, that Plaintiff had severe impairments of lumbar degenerative disc disease, morbid obesity, and dysthymia (Step 2); she did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner Listings[4] (Step 3); and the ALJ concluded that Plaintiff retained the residual functional capacity to perform a limited range of sedentary work[5] (Step 4) as

---

[3] The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.

[4] The Listings are found at 20 C.F.R. Part 404, Subpart P, Appendix 1.

[5] Sedentary work, as defined by the Regulations, "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often

follows:

> [Plaintiff] lacks the residual functional capacity to: (l) lift more than ten pounds occasionally or five pounds frequently; (2) do any job where she is not free to alternate between sitting and standing positions at least 30 minute intervals throughout the day; (3) stand or walk, combined, in excess of two hours of an eight-hour workday; (4) crawl or climb ladders, ropes, or scaffolds; (5) do greater than occasional crouching, stooping, or kneeling; (6) perform work requiring a good ability to maintain balance or walking on uneven surfaces; (7) work at unprotected heights or around moving machinery; or (8) do other than low-stress work activity (i.e. no work involving fixed production quotas or that otherwise involves above average pressure for production, work that is other than routine in nature, or work that is hazardous)

(Tr. 22). The ALJ further found that Plaintiff was unable to perform her past relevant work (again Step 4), and that she could perform a significant number of jobs in the national economy (Step 5).

The ALJ's findings throughout his sequential evaluation led him to conclude that Plaintiff was not under a disability and thus not eligible for DIB or SSI. (Tr. 16-31).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria." *Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234,

---

necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §416.967(a).

10

241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*. *See Cutlip v. Secretary of Health and Human Servs.*, 25 F3d 284, 286 (6th Cir. 1994). And the required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *See Bowen*, 478 F3d at 746. This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## V. DISCUSSION

### A. Medical Source Opinions

**1.**

Plaintiff argues that ALJ Knapp erred by failing to properly evaluate medical source opinions, emphasizing, "All the doctors agree; Ms. Moss can exertionally perform no more than sedentary work.... What the doctors do not agree on, is how long Ms. Moss can sit, stand or walk total in an eight-hour workday." (Doc. #8 at 12). Plaintiff argues that the ALJ erred by rejecting the opinions provided by treating orthopedist Dr. Pledger; whose opinions were supported by numerous findings and evidence of record and were consistent with the opinions of her treating physician, Dr. Duvall, and a consultative specialist, Dr. Smith. Plaintiff also contends that the ALJ erred by relying on the opinions

11

of Dr. Lorber, a non-examining medical source.

The Commissioner maintains that substantial evidence supports the ALJ's conclusion that Plaintiff retained the residual functional capacity to perform a limited range of sedentary. According to the Commissioner, the substantial evidence consists of the opinions provided by Dr. Lorber, and two record-reviewers, Drs. Freihofner and Holbrook. The Commissioner acknowledges that the record contains some conflicting opinion evidence from Drs. Pledger, Duvall, and Smith but the Commissioner contends, for many reasons, that the ALJ properly considered and rejected their opinions. *See* Doc. #10 at 12-15.

**2.**

Key among the standards to which an ALJ must adhere is the principle that greater deference is generally given to the opinions of treating medical sources than to the opinions of a non-treating medical source. *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see* 20 C.F.R. §404.1527(d)(2). An ALJ must apply controlling weight to a treating source's opinion when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Rogers*, 486 F.3d at 242; *see Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* §404.1527(d)(2). If either of these attributes is missing, the treating source's opinion is not deferentially due controlling weight, *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d at 544, but the ALJ's analysis does not end there. Instead, the Regulations create a further mandatory task for the ALJ:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable [data] ... or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.....

Soc. Sec. Ruling 96-2p, 1996 WL 374188 at *4. The Regulations require the ALJ to continue the evaluation of the treating source's opinions by considering "a host of other

factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician [or psychologist] is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242.

As to non-treating medical sources, the Regulations do not permit an ALJ to automatically accept or reject their opinions. *See id.* at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. §404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in §404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. §404.1572(f); *see also* Soc. Sec. Ruling 96-6p, 1996 WL 374180 at *2-*3.

**3.**

A review of the ALJ's decision reveals that he correctly described, in significant detail, the legal criteria applicable to evaluating the opinions of treating and non-treating medical sources. (Tr. 23-24). The ALJ correctly described the criteria applicable under the treating physician rule, 20 C.F.R. §404.1527(d)(2), although without calling it such. He also recognized the need to continue weighing a treating source's opinion, when the treating physician rule does not apply, and set forth the applicable factors. And he correctly recognized that opinions provided by medical experts must be evaluated under the same factors applicable to the evaluation of treating and examining medical sources. (Tr. 23-24). The ALJ's detailed discussion of the legal criteria, with citations to numerous supporting Regulations and cases, contains no error of law. *See id.*

The ALJ based his assessment of Plaintiff's residual functional capacity on the

13

opinions of Dr. Lorber. In doing so, the ALJ explained that Dr. Lorber had the opportunity to review the entire record. (Tr. 23). Although Plaintiff contends that this was not a legitimate basis to credit Dr. Lorber's opinions, the Regulations say otherwise by providing, "We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources." 20 C.F.R. §§404.1527(d)(3), 416.927(d)(3). Because Dr. Lorber reviewed the entire record and was the only medical source of record to do so, the ALJ properly considered this as a reason for accepting his opinions.

In addition, the ALJ applied the specialization factor to credit Dr. Lorber's opinion, noting that he "is a Board-certified orthopedist," a fact not reasonably disputable. *See* Tr. 23. The ALJ properly considered the consistency of Dr. Lorber's opinions with the objective medical evidence. *Id*.; *see* §§404.1527(d)(4), 416.927(d)(4). A review of Dr. Lorber's testimony, moreover, reveals that he described his review of the medical evidence in detail, especially the evidence concerning Plaintiff's orthopedic impairments. (Tr. 650-52). On cross-examination by Plaintiff's counsel, Dr. Lorber characterized Dr. Pledger's reference to Plaintiff's failed back surgery and the diagnosis of post laminectomy syndrome as consisting of very generalized, not specific terms. (Tr. 653). He then explained that the record lacked evidence of "ongoing disc herniations, causing neurologic impingement...," *id*., thus providing a basis for his disagreement with Dr. Pledger's opinions. For all these reasons, the ALJ evaluated Dr. Lorber's opinions under the correct legal criteria and his evaluation was supported by substantial evidence.

The ALJ next recognized that the record contained some opinions from examining and treating medical sources that were contrary to Dr. Lorber's opinions. (Tr. 23). The ALJ also applied the correct legal criteria to those opinions, specifically the opinions provided by Drs. Koles, Duvall, Pledger, Smith.

The ALJ placed some weight on Dr. Koles's opinions, finding them generally consistent with the evidence. (Tr. 25). The ALJ recognized that Dr. Koles provided

opinions on November 25, 2003, and he essentially accepted Dr. Koles's opinions in his assessment of Plaintiff's residual functional capacity for a limited range of sedentary work. *See* Tr. 22, 25. The only exception was Dr. Koles's opinion that headaches and diarrhea further limited Plaintiff's abilities. Substantial evidence supported the ALJ's reason for not accepting further limitations on Plaintiff's work abilities due to headaches and diarrhea because the record did not contain evidence showing she continued to suffer from these problems. *See* Tr. 25.

The ALJ discounted Dr. Duvall's opinions about Plaintiff's limited work abilities by finding her opinions unsupported by her treatment notes and disproportionate to the objective findings. (Tr. 25). These were proper considerations under the Regulations. *See* 20 C.F.R. §§404.1527(d)(2)-(3), 416.927(d)(2)-(3). The ALJ also explained that Dr. Duvall did not provide a basis for her opinions except to refer to Plaintiff's chronic back pain and deconditioning. (Tr. 25). Lack of a supporting explanation is a proper consideration when evaluating a treating source's opinions. The Regulations explain, "The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. §404.1527(d)(3). A review of Dr. Duvall's report reveals that she provided no detailed explanation in support of her opinions, listing instead only brief phrases. *See* Tr. 443-47. Substantial evidence therefore supports the ALJ's reasons for not fully crediting Dr. Duvall's opinions.

The ALJ placed more weight on Dr. Lorber's opinions and less weight on Dr. Pledger's opinions. (Tr. 26). The ALJ noted that Dr. Pledger opined in December 2006 that Plaintiff could lift two to five pounds occasionally and frequently; stand or walk for about one to two hours per eight-hour workday; and sit for about one to two hours in an eight-hour workday. (Tr. 26, 502-06). The ALJ further recognized that Dr. Pledger also believed Plaintiff could occasionally balance, kneel, and crawl, and she could never climb, stoop, or crouch. (Tr. 26, 504). Dr. Pledger also thought Plaintiff could not work at extreme temperatures or be exposed to vibration. (Tr. 26, 505). The ALJ recognized

15

that Dr. Pledger issued a statement in January 2007 explaining that Plaintiff may be able to perform sedentary work but would not be able to sit, stand, or walk for more than 10 minutes at a time. (Tr. 26, 501).

The ALJ rejected Dr. Pledger's opinions as "not supported by his treatment notes, which show minimal examination findings. Dr. Pledger did not explain the basis for his proposed limitations or cite any specific objective medical evidence that would show that claimant had unsuccessful surgery or suffered a relapse of her previously serious back condition. His opinion is also inconsistent with objective medical evidence." (Tr. 26). In this manner the ALJ discounted Dr. Pledger's opinions under the correct legal criteria. *See* 20 C.F.R. 404.1527(2)-(3). Substantial evidence supports the ALJ's evaluation of Dr. Pledger's opinions. Although Dr. Pledger consistently noted Plaintiff's reports of pain, which "comes and goes and is severe" (*e.g.*, Tr. 356), his progress notes also consistently indicate that she had normal gait, normal toe and heel walk, no muscle spasms, negative straight leg raising, 5/5 muscle strength and no swelling. (Tr. 356, 510-16, 525-27, 530). Such normal clinical findings support the ALJ's decision to discount Dr. Pledger's opinions. In addition, Dr. Pledger's January 2007 letter does not refer to objective medical test results (Tr. 501), and the form he completed in December 2006 contains no reference to objective medical evidence and only the barest notes explaining his opinions. (Tr. 502-06). Dr. Pledger also placed a question mark on one line for sedentary work, thus apparently indicating his opinion that he questioned or was uncertain whether she could perform sedentary work. (Tr. 506). Dr. Pledger then noted on this page, "Functional Capacity Evaluation will help." *Id*. His uncertainty appears again in the last paragraph of his letter where is first states that the most she could do is clerical work, then states that her limitations in sitting, standing, and walking preclude most types of clerical work. (Tr. 501). Given the somewhat equivocal nature of this opinion and Dr. Pledger's recognition that further evaluation was needed, substantial evidence supported the ALJ's finding that Dr. Pledger's opinions were not supported with explanation or objective

16

medical evidence.

Turning to Dr. Smith, the ALJ rejected his June 2007 opinions as inconsistent with his own examination findings and are unsupported, as noted by Dr. Lorber. (Tr. 26). The ALJ thus applied the correct legal criteria to Dr. Smith's opinions. *See* 20 C.F.R. §404.1527(3)-(4). Substantial evidence supports the ALJ's reasons for rejecting Dr. Smith's opinions. For example, Dr. Smith reported that Plaintiff did not use a cane, she was able to get on and off the examination table fairly easily, she had a normal gait, and she had 5/5 strength in her legs. (Tr. 572). Dr. Smith noted that Plaintiff's pain was controlled with medication. (Tr. 573).

Accordingly, Plaintiff's challenges to the ALJ's evaluation of the medical source opinions lack merit.

### B. <u>Credibility</u>

Plaintiff contends that the ALJ erred in his assessment of Plaintiff's credibility where her "pain results in her lying down for much of the day and this pain is supported by the opinions of multiple physicians and the objective medical record, including the combination of [her] back problem and obesity." (Doc. #8 at 1, 17-19; Doc. #11).

"'There is no question that subjective complaints of a claimant can support a claim for disability, if there is also evidence of an underlying medical condition in the record.'" *Cruse v. Commissioner of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)(quoting *Jones v. Commissioner of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003)(other citation omitted). "However, 'an ALJ is not required to accept a claimant's subjective complaints and may ... consider the credibility of a claimant when making a determination of disability.' " *Cruse*, 502 F.3d at 542 (quoting in part *Jones*, 336 F.3d at 476, citing *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). "Notably, an ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility." *Cruse*, 502 F.3d at 542.

17

"[T]he ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting in part Soc. Sec. Ruling 96-7p, 1996 WL 374186 at *4). Substantial evidence must support the ALJ's credibility findings. *See Cruse*, 502 F.3d at 542; *see also Walters*, 127 F.3d at 531.

Plaintiff's contention that the ALJ erred by not crediting her pain testimony lacks merit. The ALJ first noted that since Plaintiff's back surgery in December 2003, she has been treated conservatively, including, outpatient visits, physical therapy, and prescription pain medication (Vicodin). (Tr. 28). The ALJ then noted that the record lacked evidence of any periods of hospitalization or even office visits at more than regularly scheduled times for management of back pain. *Id*. The ALJ observed that examining physicians repeatedly noted her normal gait, and the ALJ provided numerous accurate citations to the record supporting this observation. *Id*. The ALJ further recognized that treating physicians have recommended physical activity for Plaintiff both for weight loss and improvement in pain levels. For example, Dr. Duvall noted in March 2006, "Encouraged her participation in aerobic activity and advised her to continue the same." (Tr. 438; *see* Tr. 441).

To the extent Plaintiff challenges that ALJ's credibility findings by relying on the opinions of the medical source of record, her challenges lack merit because, for the reasons set forth above, the ALJ did not err in his evaluation of those opinions. Although Plaintiff challenges several aspects of the ALJ's reliance on her daily activities as a basis for discounting her credibility, the record contains substantial evidence supporting the ALJ's findings. In June 2004, as the ALJ explained, Plaintiff told Dr. Fritsch that she could cook, clean, and shop. (Tr. 334). Treatment notes of Plaintiff's psychiatrist, Dr. Songer, further substantiate the ALJ's findings. Dr. Songer noted that Plaintiff has been knitting and cleaning out a room for exercise. (Tr. 538). Although knitting involves little activity, cleaning a room is inconsistent with Plaintiff's contention that she must lie down

for much of the day, as was Dr. Songer's notes that Plaintiff was building recessed bookcases cases at home, had helped a friend with yardwork, and was staying busy caring for her new dog. (Tr. 536). The ALJ further found that Plaintiff's post-surgical MRIs do not demonstrate new disc herniation or considerable stenosis. (Tr. 29). The record also lacked evidence of medication side effects that would interfere significantly with her work abilities. *Id*. These are proper consideration for evaluating and discounting credibility. *See* 20 C.F.R. §404.1529(c).

Accordingly, Plaintiff's Statement of Errors and her Reply Memorandum do not demonstrate that the ALJ erred in assessing her credibility or that substantial evidence does not support the ALJ's credibility findings.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's final non-disability decision be affirmed; and

2. The case be terminated on the docket of this Court.

November 24, 2009
　　　　　　　　　　　　　　　　　　　s/Sharon L. Ovington
　　　　　　　　　　　　　　　　　　　Sharon L. Ovington
　　　　　　　　　　　　　　　　　United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).